UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DIONIS TAVERAS and YESENIA TAVERAS,

                                 Plaintiffs,

            -against-                              **OPINION AND ORDER**
                                                            17-CV-5211-SJB
HRV MANAGEMENT, INC., REALTY 35 LLC,
BRANKO MUSTAC, JOHN MUSTAC,
and JOHN DOES #1–10,

                                Defendants.
----------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

<u>**OPINION & ORDER**</u>

      On September 5, 2017, Plaintiffs Dionis Taveras ("D. Taveras") and Yesenia Taveras ("Y. Taveras") (collectively, "Plaintiffs" or "the Taverases") commenced this action against Defendants HRV Management, Inc., Realty 35 LLC, John Mustac, and Branko Mustac (collectively, "Defendants") alleging violations under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") for failing to pay the Taverases minimum wage and overtime pay for hours worked at 31-79 35th Street in Astoria, New York. (Compl. dated Sept. 5, 2017, Dkt. No. 1 ¶¶ 2, 7). The Taverases claim that they performed superintendent duties for the Defendants but never received compensation other than a rent-free apartment. (*Id.* ¶ 6, 74; Am. Compl. dated Sept. 27, 2017, Dkt. No. 7 ¶ 6, 74).

      Plaintiffs moved for summary judgment on their FLSA and NYLL claims. (Pls.' Mot. for Summ. J. dated May 10, 2019 ("Pls.' Mot."), Dkt. No. 32). Defendants' response argues that genuine issues of material fact exist as to whether the Taverases were employees of any of the Defendants. (Defs.' Resp. Mem. in Opp. to Pls.' Mot. dated

June 7, 2019 ("Defs.' Resp."), Dkt. No. 33).  For the reasons described below, Plaintiffs'

motion for summary judgment is denied in its entirety.

<u>LEGAL STANDARDS</u>

A court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23 (1986).  "A genuine issue of material fact exists if 'the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc.*

*v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In determining whether summary

judgment is appropriate, [the Court] must resolve all ambiguities and draw all

reasonable inferences against the moving party."  *Tolbert v. Smith*, 790 F.3d 427, 434

(2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue

of material fact."  *Celotex*, 477 U.S. at 323.  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion" in one of two ways.  Fed. R. Civ. P.

56(c)(1).  It may cite to portions of the record "including depositions, documents,

electronically stored information, affidavits or declarations," "admissions, interrogatory

answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, it may show that

"the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."  Fed. R.

Civ. P. 56(c)(1)(B); *see generally Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion pursuant to Federal Rule of Civil Procedure 56, litigants in this District are required by the Local Rules to provide a statement setting forth purported undisputed facts or, if controverting any fact, responding to each assertion.  In both instances, the party must support its position by citing to admissible evidence from the record.  Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where genuinely disputed, "the Court will consider the sources for the claims made in dueling Rule 56.1 Statements . . . , rather than rely on the Rule 56.1 Statements themselves[.]"  *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015).  In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses.  *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).  Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded.  *See Congregation Rabbinical Coll. of Tartikov*, 138 F. Supp. 3d at 394 ("[T]he Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1.  The facts . . . are taken from those assertions . . . that comply with Local

Rule 56.1[.]" (citations and quotations omitted)).  The Court must also disregard conclusory denials that contain no citations to admissible evidence.  *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("Rule 56.1 statements are not argument.  They should contain factual assertions, with citation to the record. . . . They should not contain conclusions[.]").  Further, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted."  Local Rule 56.1(c). The court does not give any consideration to hearsay, speculation or inadmissible evidence in evaluating declarations or affidavits.  *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) (("[A] non-moving party must set forth specific facts showing that there is a genuine issue for trial, he or she may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." (quotations and citations omitted)), *aff'd*, 324 F. App'x 139 (2d Cir. 2009).

<u>FACTS AND PROCEDURAL HISTORY</u>

Unless otherwise noted, based on the review of the depositions, declarations, exhibits, pleadings, and other evidence, the Court has determined the following facts are beyond genuine dispute and supported by admissible evidence.  Where a relevant genuine dispute exists, the Court highlights both parties' versions of the facts.  The Court does not consider Rule 56.1 statements that are legal conclusions, irrelevant, or merely objections to inferences drawn from the opposing party's statements. Statements to which the opposing party did not respond are deemed admitted, and any statements or objections that do not provide specific line number citations to depositions have been disregarded.

This case centers around a residential building, 31-79 35th Street in Astoria, New York (the "Building"). (*See* Pls.' 56.1 Stmt. dated May 10, 2019 ("Pls.' 56.1"), attached to Pls.' Mot., Dkt. No. 32 ¶ 1; Defs.' 56.1 Stmt. dated June 7, 2019 ("Defs.' 56.1"), attached to Defs.' Resp., Dkt. No. 33 ¶ 1). The Building was acquired by Defendant Realty 35, LLC ("Realty 35") in 1993. (Pls.' 56.1 ¶ 1; Defs.' 56.1 ¶ 1; Tr. of Dep. of Branko Mustac dated Nov. 13, 2018 ("BM Dep."), attached as Ex. 1 to Defs.' Resp., Dkt. No. 33 at 11:08–11:09). The Building consists of twenty-two residential apartments. (Pls.' 56.1 ¶ 3; Defs.' 56.1 ¶ 3). Realty 35 is owned by Branko Mustac ("B. Mustac"), who is the sole member of the company. (Pls.' 56.1 ¶ 2; Defs.' 56.1 ¶ 2). B. Mustac also owns Defendant HRV Management ("HRV"), a property management company that consists of six employees and manages approximately eight buildings, one of which is the Building, which it began managing in 2006. (Pls.' 56.1 ¶¶ 4, 10; Defs.' 56.1 ¶¶ 4, 10; BM Dep. at 11:10–10:12). B. Mustac's son, John Mustac ("J. Mustac," and, together with B. Mustac, the "Mustacs"), is the Vice President of HRV and manages the day-to-day operations. (*See* Pls.' 56.1 ¶¶ 6, 8; Defs.' 56.1 ¶¶ 6, 8). Aside from these facts, the nature of the relationship between the two companies, HRV and Realty 35, is unclear. There is no formal agreement between HRV and Realty 35 and neither entity keeps corporate minutes. (Pls.' 56.1 ¶ 5; Defs.' 56.1 ¶ 5). J. Mustac testified that in 2017, Realty 35 had an annual gross income of approximately $375,000 to $400,000. (Tr. of Dep. of John Mustac dated Nov. 13, 2018 ("JM Dep."), attached as Ex. 2 to Defs.' Resp., Dkt. No. 33 at 13:05–13:06). J. Mustac also testified that HRV had an annual gross income in 2017 of approximately $450,000 to $475,000. (JM Dep. at 15:04–15:08). No tax returns or other financial records have been produced for either of the two companies.

Plaintiffs, a married couple, allege that they moved into the Building in 2003

when D. Taveras began working for Defendants.  (Pls.' 56.1 ¶ 13).  Defendants dispute

that D. Taveras began working for Defendants in 2003, noting that HRV did not even

exist as a company until 2006.  (Defs.' 56.1 ¶ 13).[1]  D. Taveras alleges he moved into the

building to work as a superintendent for the Mustacs, HRV, and Realty 35 in exchange

for a rent-free apartment.  (Pls.' 56.1 ¶¶ 13, 23; Defs.' 56.1 ¶ 23).  Aside from the free

apartment, D. Taveras never received any other compensation for his services.  (Pls.'

56.1 ¶ 26; Defs.' 56.1 ¶ 26).  D. Taveras claims his duties included garbage removal,

cleaning the common areas, cleaning the windows of the building, shoveling the snow,

being present for equipment deliveries, helping tenants move into or out of the building,

painting apartments, repairs, and showing apartments to prospective tenants.  (Pls.' 56.1

¶ 14; Tr. of Dep. of Dionis Taveras dated Jan. 9, 2019 ("DT Dep."), attached as Ex. 3 to

Defs.' Resp., Dkt. No. 33 at 45, 59–68, 74; Text Messages ("Text Messages Ex."),

attached as Ex. 2 to D. Taveras Decl., Dkt. No. 32 at 3).  He provided text messages from

Anne Melada ("Melada"), the office manager for HRV, asking D. Taveras to show

prospective tenants apartments.  (Text Messages Ex. 3 ("[Melada]: Pls show #16 today

at 4PM.  Bring keys as will not be home. Confirm[.]  [D. Taveras]: I not be home a the

time[.]  [Melada]: U have to find someone to do the showing today.  U never told me

that u were not going to be at the building[.]"); *see* Pls.' 56.1 ¶ 11; Defs.' 56.1 ¶ 11).  It is

undisputed that if D. Taveras stopped performing work for the Building, he would lose

his rent-free apartment.  (Pls.' 56.1 ¶ 25; Defs.' 56.1 ¶ 25).

D. Taveras claims that he worked between 46 and 56 hours each week; the

Mustacs deny this and contend that D. Taveras never had a work schedule and worked

---

[1] It is unclear whether Defendants also dispute that Plaintiffs moved into the
Building in 2003.

only whenever he chose to do so.  (Pls.' 56.1 ¶ 18; DT Dep. at 60:07–61:15; *see* Defs.' 56.1 ¶¶ 18, 4).  D. Taveras also claims that he had to be on the premises from 8:00 AM to 6:00 PM Monday through Friday, and Saturday from 8:00 AM to 3:00 PM; again, the Mustacs deny this.  (Pls.' 56.1 ¶ 18 n.1; DT Dep. at 71:20–71:24; *but see* Defs.' 56.1 Resp. ¶¶ 4, 18, 19).  Neither side has provided records, time sheets, or other evidence to prove the number of hours and days worked or any of their respective contentions about job duties or responsibilities.

And while Plaintiffs claim that D. Taveras was the superintendent of the building, (DT Dep. at 70:14–70:18; Pls.' 56.1 ¶ 13), which the Mustacs deny, (BM Dep. 18:13–18:14), the evidence each side has presented consists of warring denials or allegations unsupported by anything other than each party's own declarations or deposition testimony.  For instance, D. Taveras claims that there was a letter (which he personally never saw) which relieved him of employment.  (*See* DT Dep. at 76:13–76:15).  This letter stated:

> Please be advised, your services as Superintendent of 31-79 35th Street, Astoria, New York 11106 will no longer be required and will end as of August 15, 2017.  Therefore, please vacate your apartment by August 15, 2017.
>
> We would like to thank you for your services rendered and continued work at the building as Superintendent.  Your work and time are greatly appreciated.
>
> Please free to contact the office should you have any questions.

(Letter from J. Mustac to D. Taveras dated June 7, 2017 ("J. Mustac Letter"), attached as Ex. 1 to Decl. of D. Taveras, Dkt. No. 32 at 1).  D. Taveras argues this is a termination letter and evidence of his employment with Defendants.  (Pls.' 56.1 ¶ 34; DT Dep. 76:13–76:15 ("Q: Did you ever receive a letter from defendants telling you that you were no longer going to be employed by them?  A: They sent me a letter but I wasn't there when

they wrote the letter so they leave a paper.  So one day I called the office to tell them that I was going on vacation, and I was told by them that I was no longer working there.")).  J. Mustac claims that the letter is simply a "thank you" letter and does not indicate that D. Taveras was employed by J. Mustac.  (Defs.' 56.1 ¶ 34; JM Dep. 29:9–29:10 ("Q: Was this letter a termination letter?  A: No, it was a thank you letter.")).  In that vein, Defendants contend that D. Taveras was not the superintendent of the Building and that none of the Defendants ever hired him as an employee.  (Defs.' 56.1 ¶ 13; JM Dep. at 28:16–28:18 ("Was Mr. Taveras ever the superintendent at 31-79 35th Street?  A: Technically no.  Q: Okay.  So why did you call him that in the letter?  A: It's a term vaguely used as people perform services throughout buildings in New York City.  Q: Is it a term of employment as well?  A: No.")).  According to the Mustacs, D. Taveras worked for himself and performed "odds and ends" work in exchange for a rent-free apartment.  (Defs.' 56.1 ¶ 13; BM Dep. at 14:02–14:03 ("[D. Taveras] never did any work for us.  He was not employed by us."), 17:16–18:02 ("He had a free apartment in return for doing odds and ends in the building . . . . Q: Were those odds and ends required every week?  A: There were no requirements, okay?  This guy did whatever he pleased, okay? . . . Most of the time he had a full-time job, we couldn't even get ahold of him, okay?")).  B. Mustac stated that D. Taveras may have brought out garbage and cleaned the public hallways and sidewalks for a few hours a week, but did not do anything else.  (BM Dep. at 14:08–14:09, 15:09–15:10).

There is also conflicting evidence about the role played by Y. Taveras.  Plaintiffs allege that when D. Taveras was unavailable, Y. Taveras would step in to cover for him.  (Pls.' 56.1 ¶ 20).  That is, Y. Taveras would occasionally help take out trash, clean the building, shovel snow, show apartments, and stay at the apartment when he was

8

unavailable.  (Pls.' 56.1 ¶¶ 20–21; Tr. of Dep. of Yesenia Taveras dated Jan. 9, 2019 ("YT

Dep."), attached as Ex. 4 to Defs.' Mot. for Summ. J., Dkt. No. 33 at 16:24–19:11, 18:18–

18:24 ("[Defendants] told me to show apartments when he was not there, and if he was

at work and there was a complaint or something that needed to be checked, they would

tell me and I would go to check and then I would either report back to my husband or

report back to them."), 21:23–22:07 ("Q: And you were helping him when he would ask

you for help because he wasn't available; is that correct?  A: Yes, but also when he was

on vacation we were not able to take vacation because—together because someone had

to be at the building.  So when he was on vacation, then I was the one that did what had

to be done in the building.")).  Plaintiffs aver that Defendants required either D. Taveras

or Y. Taveras to be at the building.  (Pls.' 56.1 ¶ 19).

Defendants, on the other hand, aver that Y. Taveras was never asked to perform

any work at the Building.  (Defs.' 56.1 ¶¶ 14–19).  Defendants further allege that

whatever work Y. Taveras completed for the Building was on behalf of her husband and

never as an additional job duty imposed on her by Defendants.  (*Id.* ¶ 18).  Defendants

aver that she was never asked to attend meetings, shovel snow, check on the building, or

do any of the other job duties she claims she did for the building.  (*Id.* ¶ 17).  Indeed, Y.

Taveras admits that she was never hired as a superintendent, and admits that she was

never an employee of the Defendants, but was helping her husband complete his duties.

(Defs.' 56.1 ¶ 21; YT Dep. at 20:13–20:14 ("Would I agree that I was not the

superintendent?  Yes."), 21:17–21:20 ("Q: So you would agree with me, then, that you

weren't employed by the defendants, you were helping your husband with his

employment?  A: Correct." (objection omitted))).  She admits, for example, that she

always had another full-time job at First Management, a property management

company, while living at the Building.  (*See* YT Dep. at 10:02–11:12).

On September 5, 2017, D. Taveras and Y. Taveras commenced this action against Defendants alleging that Defendants failed to pay the Taverases minimum and overtime wages in accordance with the requirements under FLSA and NYLL.  (Compl. ¶¶ 93, 98). They also alleged that Defendants made illegal deductions under NYLL when they deducted money from Plaintiffs for furnishing the apartment, violated the Wage Theft Prevention Act and wage notice requirements under NYLL, and illegally retaliated against the Taverases in violation of 29 U.S.C. § 215(a)(3) and NYLL § 215.  (Compl. ¶¶ 101–31).  On September 27, 2017, Plaintiffs filed an Amended Complaint to replace Defendant 35 Realty with Realty 35 LLC, the correct name of the Defendant.  (*See* Am. Compl. at 1).

On May 10, 2019, Plaintiffs moved for summary judgment against Defendants HRV, Realty 35, B. Mustac, and J. Mustac.[2]  (Pls.' Mot. at 1).  The Taverases request that summary judgment be granted in favor of D. Taveras on his NYLL claims for liability and damages.  (*Id.*).  They also request that partial summary judgment be granted in favor of Y. Taveras as to liability under FLSA and NYLL.  (*Id.*).  Finally, they also request partial summary judgment in favor of D. Taveras as to his liability claims under FLSA. (*Id.*; Pls.' Mem. of Law dated May 10, 2019 ("Pls.' Mem."), attached to Pls.' Mot., Dkt. No. 32 at 3, 19).  Defendants have not moved for summary judgment.

For the reasons stated below, Plaintiffs' motion for summary judgment is denied.

---

[2] The Court notes that throughout Plaintiffs' brief, D. and Y. Taveras are repeatedly referred to as the Defendants, when in fact they are the Plaintiffs.  (*See, e.g.*, Pls.' Mot. at 1 ("For these reasons, Defendant respectfully asserts that summary judgment be granted as to liability and damages in favor of D. Taveras under NYLL and partial summary judgment be granted in favor of Y. Taveras as to liability and to D. Taveras as to his FLSA claims.")).

<u>DISCUSSION</u>

The record in this case is rife with disputes over material facts that cannot be resolved on summary judgment.  These include, but are not limited to: 1) whether D. Taveras was an employee of Defendants, as opposed to an independent contractor; 2) the degree of control Defendants exercised over D. Taveras; 3) D. Taveras's responsibilities; and 4) the days and hours D. Taveras worked.[3]  Plaintiffs ask the Court to grant summary judgment based on their affidavits and testimony, but on each of these issues there is conflicting testimony proffered by Defendants' witnesses.  To grant Plaintiffs' motion would require the Court to find that Plaintiffs are more credible than Defendants; because such determinations are improper at summary judgment, the Court denies Plaintiffs' motion.

I.      <u>D. Taveras's Status As Employee</u>

Under both FLSA and NYLL, employers of an enterprise engaged in commerce are required to pay covered, non-exempt employees minimum wage and overtime pay.

---

[3] Other disputes that need to be resolved at trial include the annual gross incomes of HRV and Realty 35 and whether the two companies should be treated as a single enterprise.  (*Compare* Pls.' Mem at 8–9 (alleging that the two entities are "operationally interdependent," share a common goal, share employees, and are both owned by B. Mustac), *with* Defs.' Resp. at 7–9 (arguing that the entities cannot be treated as a single enterprise when one is a holding company with no other function, there are no shared employees, and the companies do not have a parent-subsidiary relationship).  If the two companies are not treated as a single enterprise, it may be that there is no FLSA claim. FLSA enterprise coverage applies to companies with an annual gross volume of sales greater than $500,000.  *See, e.g.*, *Payamps v. M&M Convenience Deli & Grocery Corp.*, No. 16-CV-4895, 2019 U.S. Dist. LEXIS 212875, at *14 (E.D.N.Y. Dec. 9, 2019) ("Employers who have employees . . . employed in an enterprise engaged in commerce or in the production of goods for commerce (enterprise coverage) are subject to FLSA's minimum wage and overtime requirements.  Enterprise coverage exists where an employer has (i) employees engaged in commerce or in the production of goods for commerce, and (ii) an annual gross volume of sales greater than $500,000." (citations and quotations omitted)).

29 U.S.C. § 201 *et seq.*; N.Y. Lab. Law § 652; 12 NYCRR §§ 142-2.1, 142-2.2.  However, these provisions do not apply to workers who are independent contractors, *i.e.* those who are not employees, of the employer.  *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988).  To determine whether a worker is an employee or independent contractor under FLSA, courts apply the "economic reality" test.  *Id.* at 1058–59 (collecting cases); *Leevson v. Aqualife USA, Inc.*, 183 F. Supp. 3d 397, 404–05 (E.D.N.Y. 2016).  The economic reality test examines five factors: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, and (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employers' business." *Brock*, 840 F.2d at 1058–1059.  "No one of these factors is dispositive; rather, the test is based on a totality of the circumstances." *Id.* at 1059.  A similar test for determining whether a worker is an employee or an independent contract exists under NYLL, but "focuses on the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 306–307 (E.D.N.Y. 2009).

Here, D. Taveras argues that he was an employee, not an independent contractor for Defendants.  (Pls.' Mem. at 5–6).  As evidence, he points to the fact that Defendants had the power to hire and fire him, as demonstrated by the letter sent by J. Mustac thanking him for his services as a superintendent and telling him his services were no longer needed.  (*Id.* at 6; *see* J. Mustac Letter at 1).  He also argues that Defendants actively supervised and controlled the work he performed through Melada, as evidenced by the text messages which ask him to periodically show apartments to prospective

tenants.  (Pls.' Mem. at 6; *see* Text Messages Ex.).  He also claims that he was required

to be at the apartment from 8:00 AM to 6:00 PM Mondays through Fridays and 8:00

AM to 3:00 or 4:30 PM on Saturdays.  (Pls.' 56.1 ¶ 18; DT Dep. at 27:04–27:13 ("Q:

Business hours are Monday through Friday, 8:00 a.m. through 5:00 p.m.; correct?  A:

No.  It included Saturdays.  Q: Okay.  So is it your testimony that you had to be at home

from 8:00 a.m. until 5:00 p.m. every Saturday?  A: Saturdays, they want me to work

until 3:00 p.m., but sometimes they want to show the apartments until 4:30."), 43:25–

44:03 ("They told me that I have to stay until 5:00 or 6:00 to show apartments."),

60:25–61:02 ("I have to be there from 8:00 to 6:00")).

In response, the Mustacs argue that D. Taveras was contracted to perform certain

services and was never an employee of any of the Defendants.  (Defs.' Resp. at 3).

According to the Mustacs, D. Taveras worked for himself and performed "odds and

ends" work in exchange for a rent-free apartment and was not the superintendent of the

Building.  (*Id.*; BM Dep. at 14:02–14:03 ("[D. Taveras] never did any work for us.  He

was not employed by us."), 17:16–18:02 ("He had a free apartment in return for doing

odds and ends in the building . . . . Q: Were those odds and ends required every week?

A: There were no requirements, okay?  This guy did whatever he pleased, okay? . . .

Most of the time he had a full-time job, we couldn't even get ahold of him, okay?"); JM

Dep. at 28:16–28:18 ("Was Mr. Taveras ever the superintendent at 31-79 35th Street?

A: Technically no.  Q: Okay.  So why did you call him that in the letter?  A: It's a term

vaguely used as people perform services throughout buildings in New York City.  Q: Is it

a term of employment as well?  A: No.")).  B. Mustac stated that D. Taveras may have

brought out garbage and cleaned the public hallways and sidewalks for a few hours a

week, but did not do anything else.  (BM Dep. at 14:08–14:09, 15:09–15:10).  They point

to the fact that neither HRV nor Realty 35 ever set work schedules for D. Taveras, never controlled how or when D. Taveras would perform his cleaning and garbage services, and never executed a written agreement.  (Defs.' Resp. at 6–7; *see* JM Dep. at 17:14–17:24).  The Mustacs also claim that they had full-time employees who would perform the same services that D. Taveras alleges he completed for Defendants.  (JM Dep. at 19:15–20:13; BM Dep. at 15:11–15:23 ("Q: Was there anyone else who cleaned the sidewalk?  A: We did.  Our own employees. . . . We do all the work in the buildings including snow removal.  If he removed any part of the snow, it was for his own convenience, okay?  He never did it for us, you know?  We would do all of the snow removal of all of the properties ourselves with our own crew.")).  No affidavits or other evidence from or about these other employees was provided in connection with this motion.  As for the text messages from Melada, J. Mustac repeatedly denied having any knowledge about what they were about.  (*See* JM Dep. at 32:10–62:09).

Genuine issues of material fact exist as to how frequently D. Taveras performed his services for Defendants, when he performed them, whether he had a set schedule, the degree to which D. Taveras was integral to the operation of the Building, and even the extent of the services he provided for any of the Defendants.  Each of these issues are relevant to the factors for determining employee status under the economic reality test, and cannot be resolved without determining whether Defendants' testimony is more credible than Plaintiffs' testimony.  Such determinations cannot be made at summary judgment.  *See, e.g.*, *Leevson*, 183 F. Supp. 3d at 406 ("The 'economic realities' test—namely, the degree of control defendants had over plaintiffs, plaintiffs' investment in the business, the degree of skill required for plaintiffs' positions, the permanence of plaintiffs' positions, and the extent to which plaintiffs were integral to defendants'

business—present factual issues to be determined by a jury.  Ascertaining whether plaintiffs in the instant case fall under the independent contractor exemption cannot be resolved on summary judgment."); *Griffith v. Fordham Fin. Mgmt., Inc.*, No. 12-CV-1117, 2016 WL 354895, at *2 (S.D.N.Y. Jan. 28, 2016) ("Defendants argue that Plaintiffs were independent contractors as a matter of law [under FLSA and NYLL].  But the record is rife with genuine disputes as to material facts regarding the degree to which Defendant controlled Plaintiff's schedule, work conditions, and business opportunities. For example, there is conflicting evidence as to whether: Fordham required Plaintiffs to adhere to a minimum schedule[.]"); *Crespo v. Kismet Exec. Limousine Serv., Inc.*, No. 15-CV-5706, 2018 WL 3599738, at *3 (D.N.J. July 27, 2018) ("The Court finds that there are disputed facts in the record on the threshold issue of whether Plaintiffs are employees or independent contractors, thereby rendering summary judgment inappropriate at this time.").

II.   <u>Hours And Days Worked</u>

FLSA's minimum-wage provision provides that "[e]very employer shall pay to each of his employees . . . not less than . . . [the federal minimum wage]."  29 U.S.C. § 206(a)(1).  FLSA's overtime wage requirement provides that an employee working "in excess of" 40 hours in a given workweek be compensated for that "excess work 'at a rate not less than one and one-half times the regular rate at which he is employed' . . . ." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113–14 (2d Cir. 2013) (quoting 29 U.S.C. § 207(a)(1)).[4]  The NYLL mirrors the FLSA in these respects and also contains a minimum wage and overtime compensation requirement.  *Gunawan v. Sake*

---

[4] These rates may be displaced by the applicability of the Building Wage Order, *see infra* p. 17.

*Sushi Rest.*, 897 F. Supp. 2d 76, 84 (E.D.N.Y. 2012).  "Generally, an employee-plaintiff under the FLSA has the burden of proving that he performed work for which he was not properly compensated."  *Pik Quan Leong v. 127 Glen Head Inc.*, 102 F. Supp. 3d 450, 453–55 (E.D.N.Y. 2015).  Where there is conflicting testimony about how many hours Plaintiff worked, "courts have found that [this issue] . . . is essentially a question of credibility and thus inappropriate for resolution on summary judgment."  *Williams v. Bier Int'l, LLC*, No. 14-CV-3894, 2015 WL 4461668, at *2 (S.D.N.Y. July 21, 2015) (collecting cases) (quotations and alteration omitted).  "Ultimately, the dispute as to the precise amount of Plaintiff's work is one of fact for trial."  *Id.* (quotations and alteration omitted).

Here, the parties dispute the amount of hours D. Taveras worked.  D. Taveras claims that he worked 46 to 56 hours a week and was expected to be at the Building from 8:00 AM to 6:00 PM Mondays through Fridays, and from 8:00 AM to 3:00 or 4:30 PM on Saturdays.  (Pls.' 56.1 ¶ 18 & n.1; DT Dep. at 60:08–60:14, 71:20–71:24).  Defendants deny this claim, alleging that D. Taveras was never required to be in the building during those hours and that he never had a set schedule.  (Defs.' 56.1 ¶¶ 18, 19; JM Dep. at 55:10–55:16 ("A: He had his own schedule, that was it. . . . He was there when he felt like it.  There was no—there was no schedule.  Q: How would you know when [D. Taveras] was there?  A: We didn't.  We would—I would go there myself or call.  We didn't know when he was there."), 55:24–56:02 ("Q: Was Mr. Taveras required to work on the weekends?  A: No, it was whenever he was available.")).  Neither party has produced records or time sheets.  Defendants have not kept any records for D. Taveras.  (BM Dep. at 17:08–17:10 ("He was never on our payroll ever.  There was an arrangement that we had with him.  He was never our employee, never, ever.")).

Plaintiffs contend that by operation of the Building Wage Order and the presumption of accuracy accorded to a plaintiff's recitation of hours worked—in the absence of any employer records—the Court may simply grant summary judgment and determine damages by rote calculation.  Not so.  The Building Wage Order, NYSDOL Minimum Wage Order for the Building Service Industry, applies to "any person . . . engaged in whole or in part in . . . servicing, cleaning, maintaining, selling or managing buildings, . . . and all occupations, operations and services in connection therewith or incidental thereto."  12 NYCRR § 141-3.1(a).  "The Building Wage Order provides that a 'janitor's' weekly wages are determined by the number of units in the building he services.  The Building Wage Order defines a 'janitor' expansively.  12 NYCRR § 141-3.4 (defining janitor as 'a person employed to render any physical service in connection with the maintenance, care or operation of a residential building.')."  *Gil v. Frantzis*, No. 17-CV-1520, 2018 WL 4522094, at *7 (E.D.N.Y. Aug. 17, 2018), *report and recommendation adopted as modified*, 2018 WL 4299987 (Sept. 10, 2018).  "Building superintendents with [certain] job duties . . . are 'janitors' covered by the Building Wage Order." *Id.* (collecting cases).  The Building Wage Order, if applicable, would determine, among other things, the rates of pay and consideration, if any, for the apartment provided to D. Taveras.  Plaintiffs assume that the Building Wage Order controls, but fail to accord any consideration for the apartment provided to D. Taveras, (*see* Pls.' Mem. at 11–12), other than to argue that Defendants' lack of knowledge of the Building Wage Order means that Defendants cannot claim any consideration for the apartment, (*id.* at 15).  Yet, Plaintiffs cite no case for such a proposition.  But in any event, Defendants dispute that D. Taveras was ever hired to do the work that he now claims he did for the Building.  (BM Dep. 17:09–17:10 ("He was never our employee, never,

ever."), 15:11–15:23 ("Q: Was there anyone else who cleaned the sidewalk?  A: We did.

Our own employees. . . . We do all the work in the buildings including snow removal.  If

he removed any part of the snow, it was for his own convenience, okay?  He never did it

for us, you know?  We would do all of the snow removal of all of the properties ourselves

with our own crew.")).  If Defendants are correct, then D. Taveras would not fall within

the protection of the Building Wage Order, nor would he be an employee of Defendants.

Thus, the existence of the Building Wage Order and the presumption accorded to an

employee's recitation of hours worked cannot, alone, lead to a grant of summary

judgment when the threshold issue—of whether Plaintiff worked for Defendants *at all*—

is a dispute that cannot be resolved before trial.[5] *Anderson*, 477 U.S. at 248 ("[D]isputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment."); *see, e.g.*, *Leevson*, 183 F. Supp. 3d at 408

("The amount of liquidated damages and damages for notice violations plaintiffs can

recover, if any, is dependent on . . . whether plaintiffs were employees within the

meaning of the NYLL. . . . [T]hese facts are in dispute.  Whether these provisions apply

is a question for a jury."); *Calderon v. Mullarkey Realty LLC*, No. 14-CV-2616, 2018 WL

2871834, at *13 (E.D.N.Y. June 10, 2018) ("Considering all of the relevant factors, a

reasonable jury could conclude that Defendants did not treat or compensate [Plaintiff]

as a superintendent or the janitor.  For that reason, Defendants are not entitled to

---

[5] The same is true for the Wage Theft Protection Act Claims.  If Plaintiffs were not employees of Defendants, Defendants are not liable for a failure to give the requisite notices under the Act.

summary judgment on Plaintiff's overtime and minimum wage claims under the NYLL on the basis of the janitor exemption.").[6]

If D. Taveras is not a "janitor" under the Building Wage Order, but was an employee, the Court would have to then determine the actual hours he worked to determine what wages, if any, he would be entitled to receive under the NYLL and FLSA. And ultimately, the Court finds that genuine issues of material fact exist as to this question, the hours and days D. Taveras worked.  As such, summary judgment is inappropriate.  *See, e.g.*, *Pik Quan Leong*, 102 F. Supp. 3d at 454 (declining to simply rely on plaintiff's recollection of the hours worked because there was conflicting testimony from defendants, and plaintiffs' time cards were missing or lost); *Bier Intern., LLC*, No. 14-CV-3894, 2015 WL 4461668, at *2 (finding a genuine issue of material fact exists where there is conflicting testimony as to hours worked and defendants did not keep time records).

III.    Y. Taveras's Claims

Y. Taveras admits that she was not employed by any of the Defendants.  (*See, e.g.*, YT Dep. at 20:13–20:14 ("Would I agree that I was not the superintendent?  Yes."), 21:17–21:20 ("Q: So you would agree with me, then, that you weren't employed by the

---

[6] Defendants, however, should be aware, that if they are found liable, given the broad definition of "janitor" under the Building Wage Order, they cannot claim a deduction for the "market" value of the apartment provided to Plaintiffs.  The Building Wage Order limits the deduction to no more than the cost of the lowest rental on June 1, 1975, for apartments having the same number of rooms in the building, 12 NYCRR § 141-1.5, and to claim the deduction building owners have to give adequate written notice of their intention to claim a deduction, 12 NYCRR § 141-2.2.  If D. Taveras is found to be a janitor under the Building Wage Order, the actual hours he worked is largely irrelevant, because the Building Wage Order sets compensation based on the *number of units in the building*, not the hours worked.  *See, e.g.*, *Gil*, 2018 WL 4522094, at *10.

defendants, you were helping your husband with his employment?  A: Correct."
(objection omitted))).  However, even if she is not an employee of Defendants, she
nonetheless could recover under FLSA and NYLL if, under the totality of circumstances,
the "economic realities" establish that she was more than simply a volunteer helping her
husband and that the primary beneficiaries of her work were Defendants, not the
Taverases.  *See, e.g.*, *Figurowski v. Marbil Investors, LLC*, No. 14-CV-7032, 2018 WL
1582072, at *9 (E.D.N.Y. Feb. 21, 2019) ("Under the FLSA, 'employ' includes to suffer or
permit to work. . . .  [T]he definition 'suffer or permit to work' was obviously not
intended to stamp all persons as employee who, without any express or implied
compensation agreement, might work for their own advantage on the premises of
another. . . .  [T]he Court weighs whether the economic realities establish that Dorothy
was Defendants' employee or simply a volunteer helping her husband perform his job."
(citations, quotations, and alterations omitted)); *see also Draskovic v. Oneota Assocs.,
LLC*, No. 17-CV-5085, 2019 WL 783033, at *8 (E.D.N.Y. Feb. 21, 2019) ("[I]n cases
where nominally unemployed family members assist employed relatives with their
work, the status of the family members under the FLSA has typically turned on whether
the employer reaps a benefit from the additional laborers, and whether the employer is
aware of the work being performed.").  Y. Taveras argues that she should be
compensated because she was required to show apartments and perform other duties on
behalf of Defendants.  (Pls.' Mem. at 14; Pls.' 56.1 ¶ 17; Text Messages Ex. at 2–3).  She
also argues that Defendants required her to be at the apartment at expected times such
that the couple could never take vacation together.  (YT Dep. at 22:02–22:07 ("Yes, but
also when he was on vacation we were not able to take vacation because–together
because someone had to be at the building.")).  In contrast, Defendants contend that Y.

Taveras had no job duties of her own and any work she did on behalf of the apartment was solely to help her husband.  (*See* Defs.' Resp. at 13; Defs.' 56.1 ¶ 18; BM Dep. at 18:25–19:04 ("Q: Was Mrs. Taveras ever asked to perform work in the building?  A: Absolutely not.  We had nothing to do with her.")).

The Court concludes that, even viewing the facts in the light most favorable to Y. Taveras, the record is insufficient to grant her summary judgment.  She admits in her deposition that the limited work she performed was done solely to help support her husband.  (YT Dep. 18:25–19:05 ("Q: Was there ever anything the defendants in this case asked you to do that wasn't purely covering for your husband?  A:  No."), 21:17–21:22 ("Q: So you would agree with me, then, that you weren't employed by the defendants, you were helping your husband with his employment?  A: Correct." (objection omitted))).  No evidence demonstrates that Y. Taveras was directed to regularly perform additional job duties outside of what was asked of her husband to the benefit of Defendants.  What is more, the record does not support other indicators of an employee-employer relationship, such as the proposition that Y. Taveras was essential to the Building's operations or that she was economically dependent on Defendants.  (YT Dep. at 16:08–16:17 (Q: "One of the allegations in the complaint is that plaintiffs, plural, both of you were primarily employed as superintendents at the premises.  Would you agree with me that you were primarily employed at your job, your current job, First Management?  A: Yes.")).  It is difficult to say what additional benefit, if any, Defendants received from Y. Taveras completing limited tasks in lieu of her husband.  *See, e.g.*, *Figurowski*, 2018 WL 1582072, at *9 (holding that the wife was not an employee because she did not cite any evidence that she ever applied for a job, ever submitted a resume, or was hired by Defendants; and even though she helped her husband by

sending emails and shouldering some of his workload, "Defendants received no additional benefit simply because Dorothy, rather than her husband, performed those tasks."). Under these circumstances, it is impossible to conclude that as a matter of law, Y. Taveras was an employee of Defendants and should be entitled to summary judgment.

<u>CONCLUSION</u>

Plaintiffs have moved for summary judgment on an all-or-nothing basis. That is, they seek summary judgment on the entirety of one or more claims, not as to particular issues or elements of such claims. As a result, because there are disputed issues of material fact as to core issues at the heart of Plaintiffs' FLSA and NYLL claims— including the threshold issue of whether one Plaintiff was an employee—summary judgment must be denied in the entirety. *See, e.g.*, *Pik Quan Leong*, 102 F. Supp. 3d at 453–55 (denying plaintiff's motion for summary judgment under FLSA and NYLL because genuine issues of material fact existed as to hours worked). The parties are to submit a joint pretrial order by **May 25, 2020** consistent with this Court's Individual Practices.

SO ORDERED.

*/s/ Sanket J. Bulsara* March 24, 2020
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York